IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|                                                   |   |                             |
|---------------------------------------------------|---|-----------------------------|
| WILLIAM B. HARVEY,                                | : |                             |
|                                                   | : |                             |
| Plaintiff,                                        | : |                             |
|                                                   | : |                             |
| v.                                                | : | Civil Action No. 10-872-RGA |
|                                                   | : |                             |
| INTERNATIONAL READING                             | : |                             |
| ASSOCIATION, INC.,                                | : |                             |
|                                                   | : |                             |
| Defendant.                                        | : |                             |

## **MEMORANDUM OPINION**

John M. LaRosa, Esq. (argued), LAW OFFICE OF JOHN M. LAROSA, Wilmington, DE.
    Attorney for Plaintiff William B. Harvey.

Sean P. McDevitt, Esq. (argued), Kali T. Wellington, Esq., PEPPER HAMILTON LLP, Berwyn
Park, PA.
    Attorneys for Defendant International Reading Association, Inc.

March 2, 2012

*Richard G. Andrews*
ANDREWS, U.S. DISTRICT JUDGE:

On October 12, 2010, the plaintiff, Dr. William B. Harvey, filed the above-captioned action against International Reading Association, Inc. ("IRA"). (D.I. 1). Dr. Harvey alleges that IRA discriminated against him in violation of 42 U.S.C. § 1981 and breached his employment agreement. Dr. Harvey seeks compensatory and punitive damages as well as an injunction reinstating him to the position of Executive Director of IRA. Presently before the court is IRA's motion for summary judgment. (D.I. 24). For the reasons discussed, the court grants in part and denies in part IRA's motion for summary judgment.

## I.    BACKGROUND

IRA is a non-profit, global network of individuals and institutions committed to worldwide literacy. (D.I. 25 at 2). With more than 70,000 members, IRA supports literacy professionals through a wide range of resources, advocacy efforts, volunteerism, and professional development activities. (D.I. 25 at 2). IRA's mission is to promote reading by continuously advancing the quality of literacy instruction and research worldwide. (D.I. 25 at 2).

IRA's governing body is a twelve member Board of Directors. (D.I. 26 at OB- 3).[1] Each board member serves a three year term. (D.I. 26 at OB-24, § 3). The Board is required to meet at least once per year. (D.I. 26 at OB-24, § 4). The Board can also hold Special Meetings when requested by the President or a majority of the members of the Board. (D.I. 26 at OB-24, § 4). A notice of a Special Meeting must be in writing and provided to each Board member at least seven

---

[1]      Citations to "OB-" refer to the Appendix to Defendant, International Realty Association, Inc's, Opening Brief in Support of Its Motion for Summary Judgment.

2

days prior to the meeting, indicating the time and place of the meeting. (D.I. 26 at OB-24, § 5). To pass a resolution, a majority of the members present at any meeting at which a quorum is present must vote affirmatively. (D.I. 26 at OB-25, §9).

IRA's headquarters are located in Newark, Delaware and house the majority of its employees, including the Executive Director, who reports to the Board; the Deputy Executive Director, who reports to the Executive Director; and Staff Directors, who report directly to either the Executive Director or the Deputy Executive Director. (D.I. 26 at OB-5,15). Dr. Alan Farstrup, who is white, served as IRA's Executive Director from 1992 through 2009. (D.I. 26 at OB-19). In April 2006, Dr. Farstrup and IRA agreed on a contract that would employ him as the Executive Director through July 1, 2010. The parties understood that Dr. Farstrup would retire at the end of the contract. In 2009, however, the Board terminated Dr. Farstrup's employment for performance reasons. (D.I. 26 at OB- 21; D.I. 26-2 at 154). The Board voted Mark Mullen, who is also white and was then serving as the Deputy Executive Director, to be named as the acting Executive Director. (D.I. 26 at OB-4, 18). Mr. Mullen remained the acting Executive Director until Dr. Harvey began his employment in August 2009. (D.I. 26 at OB-4).

Dr. Harvey, who is African American, holds a doctorate in Anthropology of Education from Rutgers University, and has held administrative positions in academic affairs, research administration, and student affairs at several universities. (D.I. 1 at ¶¶ 9, 10). After completing a nationwide search, IRA offered Dr. Harvey the position of Executive Director and he began employment in August of 2009. (D.I. 12 at ¶ 16; D.I. 26 at OB-6-7; D.I. 26-1 at OB-90). Dr. Harvey's employment agreement was for a three year term, beginning August 1, 2009 and

3

expiring July 30, 2012 (D.I. 26-3 at OB-217, ¶2). The agreement provided that IRA could terminate Dr. Harvey's employment upon his death, disability, or for cause. (D.I. 26-3 at OB-219-20, ¶5(a)-(c)). The agreement specified that IRA shall have "cause" to terminate Dr. Harvey's employment "based upon its sole judgment that [Dr. Harvey] has not performed under the terms" of the employment agreement. (D.I. 26-3 at OB 220, ¶5(c)). If IRA terminated Dr. Harvey for nonperformance or for any other reason, with the exception of death, disability or conviction of a felony or crime of moral turpitude, the agreement provided that he would be entitled to receive a severance payment equal to one month's salary, and health and life insurance benefits, for each full year of employment. (D.I. 26-3 at OB-22, ¶5(g)). Dr. Harvey did not receive any formal performance reviews during his employment with IRA. (D.I. 26-1 at OB- 77; D.I. 26-3 at 232-33; D.I. 28 at A212).[2]

On July 14, 2010, Dr. Harvey requested a meeting with the Executive Committee during IRA's World Congress, which was held in New Zealand. (D.I. 26-1 at OB-92). Patricia Edwards, Board President, however, called a meeting with the entire Board because the members were expressing concern with Dr. Harvey's performance. (D.I. 26-1 at OB-37-39). The meeting was recorded, and a transcript of the recording (D.I. 26-2 at OB 161-98), to which the Plaintiff does not object (*see* D.I. 27 at 5 (Plaintiff citing to it)), is a part of the record. At the meeting, the Board asked Dr. Harvey questions about his progress with the strategic plan. (D.I. 26-1 at OB-71, 206). Dr. Harvey describes the meeting as an ambush (D.I. 27 at 4), while IRA describes Dr.

---

²       Citations to "A-" refer to the Appendix of Public Documents to Plaintiff's Answering Brief in Opposition to Defendant's Motion for Summary Judgment.

4

Harvey as having a meltdown during the meeting (D.I. 25 at 11). In any event, it is clear that,
after this meeting, IRA and Dr. Harvey were not on the same page.

Following the July 14 meeting, Ms. Edwards issued a written notice for a special meeting
of the Board to be held on July 25, 2010. (D.I. 26 at OB-62-63). The meeting was conducted by
teleconference and was recorded.[3] Eleven members of the Board were present at the meeting
and, therefore, a quorum was present. (D.I. 26-2 at OB-159). The purpose of the meeting was to
discuss Dr. Harvey's performance as well as to vote on any motions that came from the review.
(D.I. 26-1 at OB-76). The eleven members present at the July 25, 2010 meeting unanimously
voted to terminate Dr. Harvey's employment. (D.I. 26-1 at OB-74).

On July 25, 2010, IRA provided a letter to Dr. Harvey terminating his employment,
effective immediately, and offering Dr. Harvey $25,000 severance based on his one year of
service. (D.I. 29 at A486). IRA's offer was conditioned on Dr. Harvey's release of claims
against IRA. (D.I. 29 at A486). The notice of termination did not provide a reason for the
termination, nor did it specify under which provision of Dr. Harvey's employment agreement
IRA was acting. (D.I. 29 at A486-87). IRA provided Dr. Harvey with the reasons for his
termination in a written letter dated September 15, 2010. (D.I. 26-1 at OB-122-23).

## II.    LEGAL STANDARDS

---

[3]    At the Court's request at oral argument, the recording of the July 25 meeting was
transcribed. The parties submitted competing transcripts with inconsequential differences. (D.I.
35 & 38). Under either version, there is nothing that would assist Dr. Harvey. As there was no
agreement that the transcript should be relied upon, and was not submitted with the summary
judgment materials, the Court does not rely upon either of the transcripts.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "could affect the outcome" of the proceeding. *See Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

If the moving party is able to demonstrate an absence of disputed material facts, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Matsushita*, 475 U.S. at 587. The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment. *Anderson*, 477 U.S. at 249. Rather, the nonmoving party must present enough evidence to enable a jury to reasonably find for it on that issue. *Id.* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. DISCUSSION

Dr. Harvey's complaint alleges four claims: 1) IRA discriminated against him in violation of 42 U.S.C. § 1981 by terminating his employment; 2) IRA discriminated against him in violation of 42 U.S.C. § 1981 by subjecting him to a hostile work environment; 3) IRA breached his employment contract by terminating him; and 4) IRA breached his employment contract by terminating his TIAA-CREF savings plan and reclaiming monies deposited into it.

### A. Section 1981 Claims

Section 1981 prohibits race-based discrimination in the making and enforcement of contracts. Section 1981, as amended by the Civil Rights Act of 1991, provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by the white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a). The statute covers "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). These rights are protected from encroachment by both private and state actors. *See* 42 U.S.C. §1981(c).

Section 1981 claims are analyzed under the familiar *McDonnell-Douglas* burden shifting framework. Under the *McDonnell-Douglas* burden shifting test, a plaintiff must first establish a prima facie case of discrimination. If the plaintiff establishes this prima facie case, the burden of production shifts to defendant to assert a legitimate, non-discriminatory reason for the adverse

7

employment decision. If defendant sets forth such a reason, the burden of production shifts back to the plaintiff, who must then proffer evidence that the employer's reason is merely pretext for discrimination. A plaintiff may defeat summary judgment by either discrediting the defendant's proffered reasons or adducing evidence that discrimination was more likely than not a determinative cause of the adverse action. *See Anderson v. Wachovia Mortg. Co.*, 621 F.3d 261, 270-71 (3d Cir. 2010).

The United States Court of Appeals for the Third Circuit has stated that "the elements of employment discrimination under Title VII are identical to the elements of a section 1981 claim." *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 499 (3d Cir. 1999).[4] The elements of employment discrimination under Title VII are: (1) that [plaintiff] is a member of a protected class; (2) that [plaintiff] is qualified for the position; (3) that [plaintiff] suffered an adverse employment action; and (4) under circumstances that give rise to an inference of unlawful discrimination. *See Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410-11 (3d Cir. 1999). Dr. Harvey's claim meets the first three of these elements: 1) Dr. Harvey is African American (D.I. 1 at ¶ 6) and, therefore, a member of a protected class; 2) Dr. Harvey was qualified for the position of Executive Director, having been hired after a nationwide search (D.I. 26 at OB-6-7);

---

[4]       IRA contends that a different (and more difficult for the plaintiff to meet) standard applies when a § 1981 claim is brought as a standalone claim rather than when it is brought together with a Title VII claim, citing *Nichols v. Bennett Protective Agency*, 2006 WL 1530223 (D. Del. May 31, 2006). The court believes that the Title VII standard is the appropriate standard. However, for the reasons discussed, the issue of whether the Title VII standard or § 1981 standard applies is irrelevant because Dr. Harvey has not met the lesser burden under Title VII nor has he met his burden of discrediting IRA's proffered legitimate reasons for his termination.

8

and 3) Dr. Harvey suffered an adverse employment action when IRA terminated him from the position of Executive Director prior to the expiration of his employment contract.

As to the fourth element, Dr. Harvey contends that the fact that he was replaced on an interim basis by Mark Mullen, who is white and was then Deputy Executive Director, gives rise to an inference of unlawful discrimination. (D.I. 27 at 7). The Third Circuit has held that circumstances giving rise to an inference of unlawful discrimination would include when the position "ultimately" is filled by a person not of the protected class. *See Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1066 & n.5 (3d Cir. 1996) (en banc); *see also Waldron v. S.L. Industries, Inc.*, 56 F.3d 491 (3d Cir. 1995). The circumstances here, however, do not support an inference of racial discrimination. First, the undisputed testimony is that the Board of Directors voted Mr. Mullen as the acting Executive Director because he was then serving as the Deputy Executive Director and was already familiar with the organization. (D.I. 26 at OB-52-53). Second, Mr. Mullen not only replaced Dr. Harvey on an interim basis but also replaced Dr. Farstrup on an interim basis after Dr. Farstrup was terminated. (D.I. 26 at OB-18).[5] The fact that Mr. Mullen assumed the acting Executive Director role after both a white and an African American Executive Director were terminated undercuts any argument that Mr. Mullen's replacement of Dr. Harvey is evidence of race discrimination. Thus, the Court concludes that Dr. Harvey has not established a prima facie case of discrimination.

---

[5]     At oral argument, it was represented that the Executive Director position had not yet been filled.

In any event, even assuming that Dr. Harvey could establish a prima facie case of discrimination, IRA has set forth legitimate, non-discriminatory reasons for why it terminated Dr. Harvey. In its letter dated September 15, 2010, IRA stated:

> IRA hired Dr. Harvey in 2009 and gave him a clear mandate to develop a strategic plan to achieve the goals articulated by [a consulting firm]. IRA conveyed clearly to Dr. Harvey upon his hire that time was of the essence in developing such a strategic plan. After approximately one year, the Board had not received any written strategic plan, which caused the Board to convene a meeting with Dr. Harvey in New Zealand at which the Board worked through a series of questions and topics with Dr. Harvey to understand what progress had been made toward the development of a strategic plan and what future steps were planned to complete the strategic plan. The Board learned . . . that no meaningful progress had been made on the development of a strategic plan nor could he identify any concrete steps toward the development of such a plan. Instead, Dr. Harvey became defensive and uncooperative in responding to the Board's legitimate questions.

(D.I. 26-1 at OB-122). As might be imagined when a decision is taken by a vote, the individual reasons behind each vote might be stated somewhat differently. The Board President stated: "We terminated him for not developing a strategic plan. That's his job. That's why he got six figures." (D.I. 26-1 at OB-45). Board member Almasi stated: "My point was that we had not seen a strategic plan. He had been working on one for almost one year. We had not seen [any] evidence toward a strategic plan nor had he shown us any evidence that there were strategic planning documents." (D.I. 26-2 at OB-152). She further stated: " I voted to terminate his contract for cause. I felt he was doing a poor job." (D.I. 26-2 at OB-148). Board member Blanchard stated: "[I spoke at the termination meeting that IRA] had a deficit a couple days earlier of 1.6 million, and Dr. Harvey appeared to have no idea how to generate revenue, and basically giving us some ideas with no real action plans." (D.I. 26-1 at OB-133). Board member Risko stated: "We were convinced that no work had been done on the strategic plan and we were

concerned about [not] only his lack of effort, but his lack of attention to the importance of the strategic plan." (D.I. 26-1 at OB-78). Board member Cummins stated: "He was terminated because we did not feel he was commited to following out the goals of the [IRA]." (D.I. 26-2 at OB-212).

The transcript of the July 14th meeting is littered with references to the "strategic plan" and shows that implementation of the strategic plan was the primary focus of the questioning. (D.I. 26-2 at OB-161-98). The Board asked Dr. Harvey direct questions about his progress with the strategic plan, which Dr. Harvey did not address to the Board's satisfaction. For example, when asked whether there was a 3 to 5 year action plan laid out with specific timelines, Dr. Harvey responded "obviously we are not doing that as of this point." (D.I. 26-2 at OB-164-65). Accordingly, the "legitimate, non-discriminatory reason" that was advanced – that Dr. Harvey took no steps toward the development of a strategic plan and therefore was not performing the duties of the Executive Director diligently and properly – is not only plausible, but is also supported by the testimony of each Board member who was deposed.

Because IRA has provided legitimate, non-discriminatory reasons for why it terminated Dr. Harvey, the burden shifts back to Dr. Harvey to prove that those reasons are pretextual. To defeat summary judgment Dr. Harvey "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [IRA's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [IRA's] action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Under the first prong of the *Fuentes* test, Dr. Harvey "cannot simply show that

11

[IRA's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated [IRA], not whether [IRA] is wise, shrewd, prudent or competent." *Id.* at 765 (citations omitted). Rather, Dr. Harvey "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [IRA's] proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence." *Id.* (internal quotations and citations omitted). Thus, Dr. Harvey may meet this standard "by demonstrating, through admissible evidence, that [IRA's] articulated reason was not merely wrong, but that it was 'so plainly wrong that it cannot have been the employer's real reason.'" *Jones*, 198 F.3d at 413 (3d Cir. 1999) (quoting *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997)). Under the second prong of *Fuentes*, Dr. Harvey may rely on three types of evidence: 1) previous discrimination against the plaintiff; 2) discrimination by [IRA] against other persons; and 3) whether [IRA] has treated other similarly situated employees not within the protected class more favorably. *See Simpson v. Kay Jewelers Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998). Dr. Harvey has not met his burden under either prong.

In his answering brief, Dr. Harvey provides a laundry list of reasons why he believes IRA discriminated against him and why IRA's legitimate reasons for terminating him are merely pretext for racial discrimination.[6] Specifically, Dr. Harvey identifies nine reasons why the legitimate reason is said to be pretextual (D.I. 27, pp. 7-12), and eight reasons why an invidious

---

[6]    IRA notes that Dr. Harvey attacks only five of the eleven members of the Board who voted to terminate him. (D.I. 31 at 4). It is unclear whether Dr. Harvey would have to prove that a majority of the members discriminated against him to support a claim for discrimination. In any event, for the reasons discussed in the opinion, the court does not need to reach this issue.

discriminatory reason was the probable reason for IRA's action. None of the reasons provided by Dr. Harvey, individually or taken together, demonstrate pretext or racial animus. At most, the reasons provided demonstrate that the IRA Board was poor at supervision and treated Dr. Harvey cavalierly when it terminated him.

In regard to the evidence that IRA's reason for terminating him was pretextual, Dr. Harvey offers as reasons: (1) the Board members had not read his employment contract; (2) his contract only allowed him to be fired for "non-performance," not for poor performance; (3) there was in fact a strategic plan; (4) Dr. Harvey in fact implemented the strategic plan; (5) & (6) during discovery, IRA provided two other reasons for terminating Dr. Harvey that were not being argued in the summary judgment motion; (7) the previous Board President (who was not involved in the termination decision) did not prevent him from having a performance evaluation in the period from May 2010 to July 2010; (8) IRA described Dr. Harvey's departure publicly as him "leaving [IRA] to pursue other interests;" and (9) the decision to terminate Dr. Harvey was made before the July 25th special meeting. (D.I. 27, pp. 7-12; 29-30). It seems plain that there is no logical connection of any kind between most of these reasons (1, 2, 5, 6, 7, 8, and 9) and whether he was fired for poor performance in relation to strategic planning. Thus, those seven reasons cannot meet Dr. Harvey's burden of production on showing pretext.

The third and fourth reasons are logically connected to whether his performance in relation to the strategic plan was pretextual. Dr. Harvey asserts that the strategic plan was created by a consulting firm and, therefore, the strategic plan was already in place prior to Dr. Harvey's employment with IRA. (D.I. 27 at 8-9). IRA disagrees that the strategic plan was

13

provided by a consulting firm but instead asserts that the consulting firm merely provided IRA with recommendations from which a strategic plan was to be developed by Dr. Harvey. (D.I. 25 at 6).

In any event, the court does not need to parse through the competing claims about the strategic plan. In essence, Dr. Harvey's evidence – as summarized in his self-evaluation – is that he was implementing the consulting firm's strategic plan and the Board's strategic directions by engaging in a "potpourri" of activities to further the goals of IRA. (D.I. 27 at 2, n. 7). IRA's expectation of Dr. Harvey was that he would create, and provide to the Board, a comprehensive plan with a timetable and measurable action steps. In other words, Dr. Harvey says, "I was working hard," and IRA says, "It was not the work we hired you to do." Dr. Harvey's argument that he implemented the strategic plan consists of the following: "[T]here are abundant weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Defendant's version of the case, such that a reasonable fact finder could find it unworthy of belief. . . . See Statement of Facts, Part III.A., supra." (D.I. 27 at 29-30). In Part III.A, the relevant statement of facts is: "Clearly, Plaintiff implemented the strategic plan. See part I.B.3, supra." (D.I. 27 at 9-10). In Part I.B.3, the Plaintiff states that he implemented the consulting firm's report (citing to himself and one change he made to the organizational chart) and that he "implemented the strategic plan through numerous programs, activities and initiatives. See [Self-Evaluation]." (D.I. 27 at 2 (footnotes omitted)). IRA did not claim it terminated him for lack of activity; rather, the claim was that the activity was not doing what they wanted him to do in regard to the strategic plan. The disconnect between what the Board and Dr. Harvey understood as strategic planning is illustrated by Dr. Harvey's recitation that a "potpourri" of activities (D.I. 27 at 2, n.7)

14

and "design[ing] a new logo himself" (D.I. 27 at 2, n. 8) were evidence that he was implementing the strategic plan. However, Dr. Harvey does not explain how his lists of his activities is evidence that the Board's determination that he did not implement the strategic plan is pretextual. There is no evidence that the Board did not honestly think that Dr. Harvey was not implementing the strategic plan and, therefore, was not performing effectively as the Executive Director.

In regard to the evidence that IRA's reason for terminating him was discriminatory, Dr. Harvey offers as reasons: (1) his white predecessor, Dr. Farstrup, was treated better than him; (2) his white successor, Mr. Mullen, was treated better than him; (3) IRA did not comply with the contract in terminating him; (4) IRA violated its own procedures in relation to the termination; (5) the Board had not criticized him before firing him; (6) IRA was hostile to African Americans; (7) some of the Board Members never supported him; and (8) workplace statistics show IRA is a racist organization. (D.I. 27, pp. 12-24; p.30). It is not clear how some of the reasons (5 and 7) are logically connected to an inference of discriminatory intent, and others of the reasons (3 and 4) do not support an inference of discriminatory intent absent some comparison between Dr. Harvey's treatment and the treatment of non-African American individuals to whom he could be compared. On the other hand, reasons 1, 2, 6, and 8, as stated, could be viewed as logically connected to a showing of discriminatory intent.

Dr. Harvey asserts that his white predecessor, Dr. Farstrup, was treated better than he was. (D.I. 27 at 14). Dr. Harvey alleges that Dr. Farstrup received performance reviews, whereas he did not, and that Dr. Farstrup was allowed to "retire." (D.I. 28 at 12, 13). Dr. Farstrup is not an appropriate comparator for Dr. Harvey. Although they both served as

15

Executive Director, Dr. Farstrup served a far longer tenure (17 years) than Dr. Harvey. The expectation was that Dr. Farstrup was going to retire. When instead he was terminated a year earlier, it is perfectly understandable that both IRA and Dr. Farstrup would want to portray the event as a "retirement" rather than a "termination." Dr. Harvey's termination after less than a year could not plausibly have been described as a "retirement." As the Third Circuit has cautioned, "the mere favorable treatment of one [member of a non-protected class] as compared to one [member of a protected class] may not be sufficient to infer discrimination." *See Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998).

Dr. Harvey asserts that because his replacement, Mark Mullen, is white, that is evidence of discriminatory intent.[7] (D.I. 27 at 30 & n.86). As discussed in connection with the prima facie case analysis, this fact is not the sort of evidence of race discrimination that could lead to a finding of discriminatory intent. Indeed, because Mr. Mullen served as acting Executive Director after both Dr. Farstrup and Dr. Harvey, Mr. Mullen's appointment is evidence that Dr. Farstrup and Dr. Harvey were in fact treated equally.

Dr. Harvey asserts that the fact that he did not receive performance reviews during his employment is evidence of discrimination. It is hard to see how the presence or absence of performance reviews is relevant to IRA's motivations. In any event, the undisputed testimony is

---

[7]     Dr. Harvey asserts that Mr. Mullen "replaced" him. However, it is not clear that Mr. Mullen's position as acting Executive Director is a comparable position to Executive Director. For example, Plaintiff offers no evidence that Mr. Mullen is receiving the same benefits Dr. Harvey received as Executive Director or, indeed, whether Mr. Mullen is receiving any benefits additional to those he received as Deputy Executive Director. Mr. Mullen testified, "The position was acting. I was not a permanent position. I was not under contract." (D.I. 26 at OB-17).

16

that the former Board President requested that IRA not review Dr. Harvey during his first eleven months because she wanted to provide him with time to learn the organization. (D.I. 26-1 at OB-77; D.I. 26-3 at OB-232-33). There is also unrebutted evidence that Dr. Harvey received guidance from the Board at meetings as well as from individual members through e-mail communication. (D.I. 26-3 at OB-233).

Dr. Harvey asserts that the Board ignored his self evaluation, which was "satisfactory."[8] (D.I. 27 at 18). As a general matter, it does not seem as though the employee's belief that the employee is performing satisfactorily means that the supervisor's contrary belief is evidence of discrimination. Dr. Harvey's self-evaluation is merely evidence that Dr. Harvey disagrees with the Board's assessment that his performance was unsatisfactory. It is not evidence of pretext.

Dr. Harvey asserts that the Board undermined him by speaking directly with his staff rather than going through him. (D.I. 27 at 19). This evidence does not support a finding of pretext. It was routine practice for the Board to go directly to staff members under Dr. Farstrup as well as under Dr. Harvey. (D.I. 26-2 at OB-214-15). One might debate whether "going outside the chain of command" is a good way to run an organization, but when that is the way the organization operates, the fact that it does so is not evidence of discrimination.

Dr. Harvey asserts that IRA was hostile to African Americans. Dr. Harvey, however, provides little support for this assertion other than his own deposition testimony about

---

[8]     The self-evaluation was sent to the Board President on July 22, 2010, seeking her comments with the explanation it would be sent to the Chair of the "Headquarters Committee" the following week. (D.I. 29-5 at A476-80). Dr. Harvey was terminated in the meantime. Five minutes after the notice of termination was sent to Dr. Harvey, he sent his self-evaluation to the chair of the Executive Committee. (D.I. 31-1 at 3).

17

discussions he had with Dr. Edwards that "there was a pattern of racial antagonism" and that the antagonism was "so intense" that African Americans held separate meetings at the IRA annual conference. (D.I. 27 at 18 (citing A68-70)). That African American members of IRA met separately does not compel a finding of intentional discrimination. There are many reasons why African American members of IRA might meet separately, such as to discuss issues specific to African American educators or students, which do not relate to intentional discrimination by or within IRA. Even assuming, however, that the separate meetings were the result of "racial antagonism," the general hostility of IRA to African Americans does not constitute evidence that meets Dr. Harvey's burden under *Simpson*.

Dr. Harvey also asserts that several board members opposed efforts to diversify IRA (D.I. 27 at 19 & nn. 54-56). However, Dr. Harvey presents an incomplete and misleading record in support of this assertion. For example, Dr. Harvey claims that Marsha Lewis did not contact any historically black colleges in North Carolina to recruit for a teacher advisory panel, implying that Ms. Lewis discriminated against African Americans. (D.I. 27 at 19 & n.54). Dr. Harvey fails to mention, though, that Ms. Lewis was a grade school teacher, not a college professor, and did not contact any universities at all. (D.I. 31-2 at 2-3). Dr. Harvey similarly criticizes Dr. Cummins and Dr. Risko for failing to diversify IRA (D.I. 27 at 19 & nn.55-56), but does not acknowledge that Dr. Cummins testified that she worked closely with Grambling State University, a historically black university, and that Dr. Risko tried to start a chapter at Tennessee State University, another historically black university. (D.I. 31-3 at 3; D.I. 31-4 at 4). Considering Dr. Harvey's evidence as supplemented by IRA's evidence, the court cannot infer from the fact that the Board may not have successfully diversified IRA's membership that the Board intentionally

18

discriminated against Dr. Harvey or other African Americans.

Dr. Harvey also cites as evidence of discriminatory intent that the racial breakdown of IRA's employees was: 77 white, 4 African American, 4 Hispanic/Latino, and 1 employee of "two or more races," and that the Board that fired him consisted of 10 white, 1 African American, and 1 Asian. (D.I. 27 at 23, nn. 70 & 71). It would be unusual that raw numbers, with no further analysis, would meet the plaintiff's burden under *Simpson* of showing discrimination against others, and the evidence cited by Dr. Harvey is not compelling. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 542-43 (3d Cir. 1992) (noting that "[s]tatistical evidence of an employer's pattern and practice with respect to minority employment may be relevant to a showing of pretext" but finding that "raw numerical comparisons . . . not accompanied by any analysis of either the qualified applicant pool or the flow of qualified candidates . . . are not probative of [an employer's] alleged discriminatory motive.").

In addition to these arguments, Dr. Harvey makes numerous other assertions about his termination, none of which are in any way relevant to racial discrimination. For example, Dr. Harvey complains that he was fired by e-mail. (D.I. 27 at 3). Although this manner of terminating Dr. Harvey may be "cowardly" as Dr. Harvey asserts, it hardly is evidence of racial discrimination. Dr. Harvey also complains that the e-mail did not provide a reason for termination. (D.I. 27 at 3-4). As discussed below, this allegation raises a claim for breach of Dr. Harvey's employment agreement but does not suggest racial discrimination in any way.

Dr. Harvey has failed to offer sufficient evidence to create a jury question that IRA's stated reasons for his termination are pretext for racial discrimination and, therefore, the Court

must grant IRA's motion for summary judgment as to Count I.

In addition to alleging that IRA discriminated against him by terminating his employment, Dr. Harvey also alleges that IRA discriminated against him by subjecting him to a hostile work environment. To prove a prima facie case of racial discrimination based on a hostile work environment under § 1981, a plaintiff must demonstrate that: (1) he suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability. *Ocasio v. Lehigh Valley Family Health Ctr.*, 92 Fed. Appx. 876, 879 (3d Cir. 2004) (citing *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996)). To prove the second element, a plaintiff must show "'discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive as to alter the conditions of the victim's employment.'" *Thompkins v. Mercy Philadelphia Hosp.*, 2010 WL 3719099 (E.D. Pa. Sept. 20, 2010) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

Dr. Harvey has not alleged conduct that is so severe and pervasive that it interfered with his job performance. Indeed, Dr. Harvey admitted that he was not subject to racial epithets, did not witness racial symbolism, was not threatened or intimidated because of his race, and that no derogatory racial comments were made to him (D.I. 26-1 at OB-101-02). At most, Dr. Harvey relies on the same facts on which his claim of improper termination is based. Specifically, Dr. Harvey's hostile work environment claims rests upon the following allegations: 1) IRA did not provide Dr. Harvey with any criticism or employee performance appraisals; 2) the Board of

20

Directors attempted to undermine his authority by bypassing him and communicating with subordinate employees; and 3) the Board did not give him a fair opportunity to speak at the New Zealand meeting. (D.I. 27 at 30-31 & n.87). Such facts do not rise to the level of severe and pervasive; indeed, they do not remotely suggest racially discriminatory conduct. *See Daughtry v. Family Dollar Stores, Inc.*, 2011 WL 4943927, at *7 (D. Del. Oct. 18, 2011). With respect to Dr. Harvey's evidence that the Board of Directors undermined him, undermining an employee's authority does not support a hostile work environment claim. *See Blakney v. City of Philadelphia*, No. 10-4237, 2011 WL 4402962, *9 (E.D. Pa. Sept. 22, 2011).

Accordingly, Dr. Harvey has failed to offer any evidence that he suffered severe and pervasive discrimination in the workplace and the Court must grant IRA's motion for summary judgment as to Count II.

### B. Breach of Contract Claims

In Count III of his complaint, Dr. Harvey alleges that IRA breached his employment agreement by terminating him before the expiration of the agreement's three year term. Dr. Harvey's employment agreement is governed by Illinois law. (D.I. 26-3 at OB-223, ¶14). Paragraph 5(c) of the employment agreement provides that "IRA may terminate the executive's employment hereunder at any time for Cause. For purposes of this Agreement, IRA shall have cause to terminate the Executive's employment hereunder based on its sole judgment that the Executive has not performed under the terms of this Agreement." (D.I. 26-3 at OB-220, ¶ 5(c)).

Although IRA could exercise its "sole judgment" to determine that Dr. Harvey had not performed under the contract, under Illinois law, IRA's discretion was not entirely unbounded.

IRA's decision to terminate Dr. Harvey's employment had to "be made honestly in accordance with [its] duty of good faith and fair dealing." *Beasley v. St. Mary's Hosp. of Centralia*, 558 N.E.2d 677, 682 (Ill. App. 1990) (citing Restatement (Second) of Contracts § 228, comment a, at 182 (1981)). In *Beasley*, the Illinois Court of Appeals held that, where the employer reserves the right to subjectively assess the performance of an employee, the court should not disturb that assessment absent a showing of bad faith. *Id.* at 682 ("The only limitation is that the obligor's decision to terminate the contract based on dissatisfaction must be made honestly in accordance with his duty of good faith and fair dealing.") (citing Restatement (Second) of Contracts § 228, comment a). Therefore, IRA was required to subjectively believe in good faith that Dr. Harvey had not performed under the contract. For the reasons already discussed, IRA provided legitimate reasons why it felt Dr. Harvey had not performed under the contract. Dr. Harvey has not offered any evidence that IRA's decision was made in bad faith. Accordingly, IRA did not breach the contract by terminating Dr. Harvey for non-performance.

IRA, however, did breach Paragraph 5(e) of agreement when it terminated Dr. Harvey. Paragraph 5(e) of the employment agreement provides that IRA must communicate a written notice of termination to Dr. Harvey and that the notice "shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances, if any, claimed to provide a basis for termination of the Executive's employment under the provision." (D.I. 26-3 at OB-220, ¶5(e)). The notice of termination did not come close to complying with paragraph 5(e).[9] When an employment contract allows for termination

---

[9] The July 25, 2010 letter stated: "[T]his letter is to advise you that your employment is terminated effective immediately and that you may not represent to anyone that

22

based on the sole judgment of the employer and provides that contemporaneous with the termination the reasons be provided, it would appear to be a material breach not to provide the reasons at the time of termination. The effect of the September 15, 2010 letter providing the reasons,[10] and the proper measure of damages, have not been briefed. On February 1, 2012, IRA notified the Court that it had tendered an unconditional payment of $51,041.70 to Dr. Harvey. (D.I. 39). The payment was said to compensate Dr. Harvey for the period from August 1, 2010 through September 15, 2010, the date on which IRA provided a notice of termination as called for under Paragraph 5(e) of his employment agreement. The payment also was said to compensate Dr. Harvey for his contractual severance as provided for under Paragraph 5(g) of the employment agreement. An open question remains as to whether Dr. Harvey is owed further compensation for health and life insurance benefits. (D.I. 40).

In Count IV of his complaint, Dr. Harvey alleges that IRA breached his employment agreement when it terminated his TIAA-CREF Savings Plans and reclaimed all monies it previously deposited into the account on his behalf. (D.I. 1 at ¶ 131). IRA contends that it is

---

you are authorized to act on behalf of IRA." The letter did not indicate the specific termination provision upon which IRA was relying and did not set forth any facts or circumstances IRA was claiming provided a basis for Dr. Harvey's termination.

[10]     The September 15, 2010 letter stated: "IRA terminated Dr. Harvey's employment pursuant to Section 5(e) of his Employment Agreement, because, in IRA's sole judgment, Dr. Harvey has failed to perform under the terms of this Agreement. IRA has determined in its sole judgment that he failed to perform the duties of the Executive Director position in a diligent and proper manner, nor had he devoted his full time and business attention to the performance of services for IRA." (D.I. 26-1 at OB-123). The letter also noted that the Board was concerned after the New Zealand meeting that Dr. Harvey had not made "meaningful progress" on a strategic plan and was concerned about Dr. Harvey's "infrequent presence at IRA's corporate offices ... [and had] questions surrounding reimbursements for moving expenses, travel expenses and housing expenses." (D.I. 26-1 at OB-122).

entitled to summary judgment on this claim because Dr. Harvey's claims are preempted by ERISA and Dr. Harvey has failed to exhaust his administrative remedies as required by ERISA. However, Plaintiff conceded both in his answering brief and at oral argument that Count IV is not a standalone claim. (D.I. 27 at 34; D.I. 34 at 2). Thus, IRA is entitled to summary judgment on Count IV. That does not, however, resolve the ERISA issue.

Dr. Harvey asserts that his loss of ERISA benefits is an element of the damages of his discharge. Thus, the issue is relevant to the damages available pursuant to Count III. Where a plaintiff merely asserts that his loss of ERISA benefits is an element of the damages of his discharge, state law claims are not pre-empted. *See Pizlo v. Bethlehem Steel Corp.*, 884 F.2d 116, 120 (4th Cir. 1989). Accordingly, Dr. Harvey's claim that IRA breached his employment contract by terminating his TIAA-CREF Savings Plan is not preempted by ERISA.

IRA further contends that, if the ERISA claim is not preempted, it is nevertheless entitled to summary judgment on the issue because Dr. Harvey does not have standing to assert a breach of contract because Dr. Harvey was not 100% vested in the portion of the Savings Plan attributable to IRA's contributions. (D.I. 25 at 35). IRA is correct that under the terms of the Savings Plan, Dr. Harvey is vested only on the third anniversary of the effective date of his employment agreement. (D.I. 25 at 35; D.I. 26-3 at OB-245, ¶3.6(b)). The Savings Plan further provides that "[i]f a participant ceases to be employed by the Employer prior to the third anniversary of the effective date of his employment agreement, such Participant will forfeit the portion of his benefit attributable to Employer Non-Elective Contributions and the earnings thereon (unless otherwise provided in his employment agreement) and such Participant, or his

24

beneficiary, shall not have any further entitlement to amounts so forfeited." (*Id.*). Thus, IRA

could terminate Dr. Harvey's participation in the plan upon Dr. Harvey's termination from IRA

and reclaim any money it contributed to the Savings Plan because Dr. Harvey did not remain

employed for a continuous period of three years. Accordingly, the Court concludes that IRA is

entitled to partial summary judgment on Count III that Dr. Harvey is not entitled to damages for

termination of his TIAA-CREF Savings Plan and IRA's reclaiming of money it previously

deposited because Dr. Harvey was not 100% vested.

## IV.   CONCLUSION

For the reasons set forth above, the Court will grant IRA's motion for summary judgment

as to Counts I, II, and IV and will grant partial summary judgment on Count III that IRA did not

breach Dr. Harvey's employment agreement by terminating him prior to the expiration of the

agreement's three year term and that IRA is not liable for damages relating to the termination of

his TIAA-CREF Savings Plan, and otherwise deny IRA's motion for summary judgment as to

Count III. A separate Order, consistent with this Memorandum Opinion, will be entered.